I'll turn to 24-4076, Moxie Pest Control v. Nielsen. Mr. Hatch. Thank you, Your Honor. May it please the Court, this is, starts out as a very kind of exciting case because it has, it's a corporate espionage case. There are facts alleged that the Court found that shows subterfuge, bribery, theft of trade secrets, and then it gets decidedly less exciting, but important. The judge in two paragraphs in his order at the district court level determined that there was not sufficient causation for damages. And he cited seven facts. Those facts show essentially the front end and the back end. It shows the front end that there was a theft of trade secrets. And on the back end, it shows that there was an increase in the number of sales representatives, the increase of sales, increase of profits. They claimed that there wasn't anything in the middle to connect those two. And said it would only be speculation if we jumped from one to the other. Is causation an element of a DTSA claim? It's an element of the unjust enrichment damages portion. But not necessary for injunctive relief? Not for injunctive relief. Is that still in the case? I believe it is. So here, the judge in his order did not fairly characterize all the evidence of the record that was in front of him that would connect those two dots. And at pages 4 to 15 of our opening brief, and it's discussed at pages 21 to 24 of our brief, we set forth all the facts that connect the middle. It talks about Aptiv being the largest direct competitor, and it cites two depositions and declarations. It says that Aptiv generates its revenues through these customer sales representatives, which are door-to-door salesmen, and they sell approximately 80 to 90 contracts per season. Through a deposition, through another deposition of Aptiv, it determined that they wanted the power of Moxie's tracing and information to increase the recruiting of sales representatives. So the causation wasn't that the sales personnel for Aptiv would be better. It was, your argument was that they got more sales representatives than they would have otherwise. Yeah, this entire business, and I think maybe, you know, I was not the counsel below, but it seems that the district court did not make a determination or have a complete understanding of how this business works. This is a business that does door-to-door sales, and the entire business is getting competent, and a sufficient number of competent door-to-door sales people that your business can grow. So the causation would have to start with Aptiv getting more sales representatives. Correct. And you had that data. Correct. They did have more sales representatives. Correct. But then you have to show that that's because of their use of your trade secrets. Is that the argument you're making? Well, yes. I want you to understand, the court to understand the business here, because the whole business is recruiting these sales agents. This isn't a case of trade secrets like when you're looking at phones, for instance, and there's a number of issues. It could be a number of reasons why people buy a phone. They might like the battery life. They might like the big screen that's thinner. But there are also plenty of reasons why they might have been able to hire more people, but you need to show that they were able to hire more people than they had been by using the information about Moxie's business. Right. Is that right? And the question for this court. Do I have that right? Yes. Okay. The question for this court, though, because that ultimately is a fact issue, is whether there were enough facts in the record that a reasonable inference could be drawn or a direct inference that that is why Aptiv was able to recruit as many as they were able to recruit. Okay. And those are the types of facts that I'm talking about are 4 to 15. I mean, it talks about, you know, in several depositions of the Aptiv people, it talks about how this trade secret information was shared throughout the organization. Employees were instructed to use it to recruit. It was used in recruiting. It talks about the battle. One of the depositions cited in our brief talks about the battle to recruit against Moxie. Understanding this is the business. Because this is a well-developed business in the sense that you can't – there's a reason why these types of companies are located in Utah County, Utah, in and around Provo. And in some degree, they bleed over into St. George, Utah, Salt Lake City, and Logan. Because they get all the students. You have a gold mine of people you don't have to train to do this, that have been missionaries for the Church of Jesus Christ of Latter-day Saints, who come back and they're going to school. And this is a great summer job. They've already been trained. They've already done a two-year tour 24-7. They're not afraid of knocking on doors. They're not afraid of rejection. What the judge seemed to be bothered by is you, I don't think, had evidence of any particular person who was convinced through the trade secret information to go to work for Aptiv rather than Moxie. Well, I don't think that's – Do you have anyone that – Yeah, I don't think that's – I decide to go to Aptiv because I learned from this data that I'd make more money with Aptiv than with Moxie. Did anyone – was there any sales rep that said that? Yeah, I think there's a deposition. I think it's cited in the appendix 26, pages 69, 41 to 42. There's a deposition of Aptiv's executive discussing his use of that information to recruit Gus Becker and Spencer Raymond. There's numerous instances where they paid $100 to try to meet with Hayden Clifford to try to get him – use the information to try to get him to switch sides. And just the fact – I think it's a reasonable inference that in using this information and doing it for two years and paying and going through all the subterfuge and the bribery and the theft, that they understood that this information was – I think a reasonable inference that this information was vital to them increasing their recruiting of sales reps. Is your understanding that the district court thought that this evidence was somehow not relevant to causation or it wasn't – the quantum was off? How do you read that? Yeah, but we say that in the brief, but the judge certainly made no such – he just did not list it. And I think that – He simply did not what? He did not list any of the facts that we've laid out in our brief that I've been talking about here. He didn't confront those. He didn't confront any of those. He basically just said, yeah, you did, and he called it – I thought it was a little generous to call it bad business behavior, but he talks about the theft and he talks about the increased sales at the end, but he doesn't give any credence at all to any of the facts, which I think reasonable inferences can be drawn from, that show that it was used extensively. It was used in almost every recruiting meeting. It was seen as that important to active to use that they continued for a period of two years and were willing enough to give people money. There's at least one instance of giving someone – in their words, skewer moxie, you give them $1,000 and a rare pair of Nike Air Jordan tennis shoes. I think the judge – my understanding is the judge was concerned that – he didn't disagree with any of this. He just said you can't make those big inferences that you're wanting to make, that it was too speculative in the sense that there could have been many reasons why any particular salesperson went with moxie. We don't know. You're assuming that every increased salesperson that they had was there for one reason and one reason only, and that's a big inference. And then you also had to make a second inference that once they got there, those increased salespeople, the number of increased salespeople, were responsible for the increased income that they had. Let me unpack it. I think there was a lot of inferences, and the judge was struggling with the idea of where am I – what am I basing these inferences on? Yeah, I mean, there's about four things there. Let me unpack them. One is I think – I don't think there's any challenge to the fact – on the facts. The facts were agreed to. I mean, they didn't challenge them in these briefs that their business and sales recruit – that they get – the average one gets 80 to 90 sales. Yeah, that's not what I'm saying. All of those – I didn't mean to suggest there was. I think those were all givens, but that doesn't give you that next step. And the judge seemed to be saying it's too speculative to assume that that increase was just for – just for this reason. I think this was – for instance, I mean, just to give you an example, wasn't this during COVID 2020, 2021? 29 to 20, yeah. Yeah, I mean, it was – I mean, one reason could be that, you know, we had more people that needed jobs. They were at home. They needed jobs in their hometown, more college students at home, more people applying for these jobs. Another reason could be that – and the people were at home when they – when these college students came around, they were there and were interested in pest control. I mean, my point is there's a lot of inferences that you could make in addition to the one that you want the court to make. But my experience in trade student cases and things like this is that you have to point to something. So typically – Of course, yeah. You know, so the most reasonable inference here is that these – all of these facts taken together – and I'm talking about the facts in our facts section of 14 – pages 14, 15 of our brief. All those taken together, it's a reasonable inference that it happened. Now, you raise – there's a couple other parts of what you raised, one of which is we – at the court – at the district court level, we did not say that every single one of these people would have taken a job because of the information shared to them that was a trade secret. As a matter of fact, that's one of the reasons the expert – what's her name? Susan – whatever. You know, she – we developed a thing to say how many of these people reasonably would have taken this into account, and she came up with the amount of 38%. So the claim, even at the district court level, wasn't 100%. So I think there's a reasonable inference that it would have happened. There's expert testimony to make a determination of what below 100% it would have been. But the third thing that I would say, Your Honor, is in most of these cases that I've been involved with are a lot like the example I gave earlier about the phone. You would have expected, if it was speculative, for someone to do just what you did, to be able to give some factors that may have made it speculative. In the phone example, you say, Well, you're saying they stole your idea for an antenna, but a lot of people want to buy it because of longer battery life or because it's thinner or has a bigger screen. And so you're just speculating. So how do you tie it down to the antenna? Well, we tied it down to the only thing that's in the record, which is your sales are completely dependent upon these salespeople. And it's interesting to me that the judge, and certainly not the appellees, in any of their briefs, gave any other reason for why those would be there. So we're the only ones who, through an expert, took it down from 100% to 38%. It wasn't their burden. I understand it wasn't their burden, but to be speculative, there has to be something that makes it speculative. And the record evidence here is the judge didn't find anything. There's nothing in that opinion that would give, say, the things you're talking about or give the antenna, the battery, the whatever. So in this instance, when you have extensive evidence showing that they routinely use this, it was key to them. They knew that this would be used to be able to skewer MOXIE. This was going to allow them to compete for a limited pool, because part of your original question assumed a much bigger pool. For instance, the COVID, just having time on your hand because of COVID isn't going to make you a good sales rep. There's a limited pool, and essentially I'll colloquialize it to Provo, Utah, that really are, if you spend your time trying to seek any representatives from anywhere else, you're going to have to train them. There's a whole new level of your business that you're going to have to implement to be able to make sales than being able to go to an area where people have already got two years of intensive training and aren't afraid to get out and do this kind of thing. I can address any other issues. I'll save a minute for rebuttal if I can. Thank you.  Mr. Stewart. Good morning, Your Honors. Thank you for having us. May it please the Court. Mr. Hatch raised a few interesting things that I'd like to respond to right off the bat. Judge Hartz, as to your question, no, Moxie Below did not identify a single individual who fit the criteria of being successfully recruited because of the trade secret information or selling for active. That's just a fact. In support of its opposition for summary judgment, Below, Moxie, identified a single individual by the name of Zach Benson. Zach Benson submitted a declaration that said, I was shown something. I don't remember what it was. I went out to sell for active, and I quit on day one and never even went and knocked a door, so I didn't sell anything. So setting aside the question of what he was or wasn't shown, there was no evidence that he had caused any enrichment of active. It's really what's interesting, and I was counsel Below, trial counsel, Moxie really became a victim of the architecture of its own damage theory, and by that I mean their expert, Rick Hoffman, made six causal assumptions for his unjust enrichment. His unjust enrichment was number of ill-gotten sales representatives times the average value of a sales rep, and that's how he got to his number. So his fifth causal assumption was what he called the hiring assumption, that individuals joined active because of the confidential information. His sixth causal assumption was the selling assumption. Those individuals, in fact, sold for active and therefore enriched them, and he said, I don't have an opinion on that causation. Moxie informed me that they're going to introduce evidence at trial to support the facts that some individuals joined active because of the use of the information, but they never did. And the survey report that Mr. Hatch refers to, done by Sarah Butler, did a correlation study where she asked a number of respondents if company A, hypothetical company A, told you that it had a better track record of sales and you would make more money with company A, would you be more interested in company A? An unquantified increase in interest. But it shows motivation for your target demographic. It shows, well, what's interesting, the number was 38.6. So as Judge Kimball identified, that's less than 50%. So I didn't understand what difference that made, when the point is you're trying to estimate what percentage of people were recruited because of the trade secrets. If the trade secret showed that you make more money for active than with Moxie, then that seems reasonable. A third of the people, a little more than a third of the people. Will be induced by evidence that you'll make more money there. And it doesn't have to be more than 50%. But it's an unquantified, this is what Judge Kimball correctly found. That merely shows correlation. That is a correlation between an unquantified increase in interest and these two facts that you told the survey respondents. And they didn't survey the trade secret. They just did a hypothetical, if I told you, you would make more money. It wasn't a definitive number for your purposes. But the fact that the number was less than 50%, I don't understand why that matters. Because Moxie had a preponderance of the evidence. Well, I understand where you're coming from, Your Honor. I do. If the argument is, well, it's probative of what might increase a hypothetical recruit's interest in working in door-to-door sales. Sure, it's probative of that. And the fact that it's less than 50% doesn't matter. I thought it was remarkable and surprising that less than 50% of people said that they would be more interested if you were going to make more money. But nonetheless. And so does those causal assumptions specifically that matter, and here's why. Because in this court's recent opinion in GeoMet Watch, it took great pains to distinguish between inference and speculation. And it ultimately concluded that there is not, if there's not foundational evidence for the conclusion the plaintiff is seeking the jury to reach, that's speculative. And so that's important here because the conclusion is not a general, you wanted the information, you must have thought it was valuable, ergo, somebody must have joined your company because of the use of it. I don't think that's so speculative. In the criminal context, if you can show that the prosecutor intentionally destroyed evidence, we have a presumption that it was harmful to the defendant. Otherwise, why would you have, I mean, it would have been helpful to the defendant. Otherwise, why would you destroy it? Here, the fact that they're spending money to get these, I realize you're contesting whether they're actually trade secrets, but that's not an issue in appeals. Absolutely. But if you're spending money to get this information, that's pretty much an admission that this information is economically useful to you. I think that eliminates a lot of the speculation, doesn't it? But it doesn't matter because what Moxie would have asked the jury to do is find the number of ill-gotten recruits and multiply it by this number. And there was no record evidence from which the jury could conclude that anybody joined Aptiv because of the information. The jury would have had to create that out of whole cloth. And that's the point of GeoMet Watch, is it's a rather big deal to put a jury in a box of evidence. And what about Benson? That's not evidence? No, because Zach Benson's declaration was, they showed me something that caused me to believe I would sell more for them. That influenced my decision to join Aptiv, but I never sold any accounts. Okay, so why is that not enough to get to a jury? Because there was no evidence of enrichment. What would the jury do with that? Well, together with the other evidence offered, it just seems to take it apart in bits and pieces, defeats our inquiry on causation. Do you follow? The district court said that this is all about correlation. This is not causation evidence. We have to look at the totality. And it seems to me that there was enough to get to a jury on the question. And then the issue really does become one of quantification. And that's where I think GeoMet Watch stands for the proposition that there is this difference between an inference, which this court defined as a deduction of the existence of a fact, which through human experience is proved by the existence of other facts. And so there's not a predicate fact about joining Aptiv and selling Aptiv. There's no evidence. In fact, the evidence is nobody joined Aptiv because of the use of the trade secret information. Well, that's where I think there is strong evidence. Because even after a year of having used this trade secret, alleged trade secret information, Aptiv still thought it was worth spending money to get the next years. And would they do that if they didn't think they were making more money, in other words, hiring more people as a result? I think that's a valid inference. But let me state it in broader terms. Once you have a wrongdoer, the plaintiff just has to provide reasonable evidence, the amount that you can expect in the circumstances. What evidence do you think they could have put on and didn't that would have been enough? Testimony from somebody who says, I joined Aptiv because I was shown the trade secret information. And to your point, I expected Mr. Hatch to lean into the bribery. I mean, we contested those things, but those inferences were drawn in his favor. Fair enough. But what this court pointed out in GeoMet Watch, the emails from the defendant put a final nail in their coffin. They can't still think they're in the game. Devastate the competition. And finally, the plan includes to have GeoMet Watch burn in hell. And this court said none of that matters. Because none of that solved the causal problem that GeoMet Watch had, which was it had no evidence that a substitute guarantor was going to step in and backstop the $100 million loan that had been pulled away. That's the causal fact that matters. What about their argument that the judge prevented them from conducting further discovery? That's an interesting argument. So under Pump v. Kelly, that's an abuse of discretion. This court's decision, Pump v. Kelly. But the problem is, and what I love Pump v. Kelly, because it basically says, this court says, don't propound over broad discovery and expect the trial court to fix that for you. That's what it stands for. The discovery they sought, they sought five years, back to 2016, of all our customer contracts and our employment agreements. 2.1 million customer contracts, 20,000 employment agreements. Judge Jenkins said, that's too much. I think I would give you the 2019 and 2020 rosters. And they never came back and asked for it. They waived that. And that's Pump v. Kelly. Was that a final decision by Jenkins, that that's the most you'll get is those rosters? No. As part of that order, he extended fact discovery another four months. He actually ordered a balance of each company's rosters. And that resulted in five names. And the plaintiff didn't even go take the depositions of those five individuals. Because they didn't want actual evidence of causation. They wanted to use a fancy survey expert that establishes correlation. And then have their damage expert, Rick Hoffman, the same expert in GeoMet Watch, multiply the ill-gotten recruits by an average value of sales rep, 180,000. Well, why would you use a value that... ...to interview every sales rep? If they had gotten a representative sample, that would have been enough, don't you think? To get to a jury, yes. Can I switch to a couple other issues? Absolutely, sir. When you move for summary judgment, you said we're not seeking an injunction... to stop the injunction. That's correct. We have to send it back down for that issue, do we not? Well, I think that the court's finding of a lack of causation of damage is the equivalent of the absence of evidence of harm that would support an injunction. But causation is not an element of the claim if you're seeking an injunction under the statute. No, no. And under... I'm glad you asked that, thank you. Under both trade secret acts, and those are the statutory injunctions they sought, it's actually forward-looking. An injunction is available to a plaintiff if it's necessary to prevent attempted or misappropriation of a trade secret. But it's just unfair to not move for summary judgment on the injunction so they have no reason to respond and explain why they think an injunction should be enforced. I mean, that's just not fair. I fundamentally understand that, Your Honor. I do fundamentally understand this. Now, it has been over four years since there's been any allegation of the use of this information. You may well win on that. Right, but on a procedural standpoint, yes. They said, we have this injunctive claim, and our opposition to the summary judgment said, we're not moving on injunctive relief. Okay, the other thing is royalty relief. Yes. This is a problem by having two judges. Yes. One judge has to understand what the problem is, and I've seen this many times happen, that there just isn't the communication that would happen within one person's brain. So he says, that doesn't mean, this is what Judge Jenkins said, that doesn't mean that we can't talk about damages, so I think at this point what I'm going to do is deal with the question of royalty and indicate I'm not going to preclude people from talking about damages, but I'm not going to deal with anything called royalty. Then explain, we'll skip characterizing anything as royalty, but nothing says we can't talk about licenses, which is an equivalent notion in this context, at least, where damages are value of running off with something that doesn't belong to you. To that modest extent, I'll grant your motion. That, to me, doesn't read as foreclosing royalties. The judge may have had good reason for not allowing royalties to proceed, because the offer of evidence on the subject was pretty, but if that's not challenged, that's like with the injunction, if that's not challenged in your summary judgment, we also should get summary judgment with respect to their potential royalties claim, then the plaintiff doesn't have a reason to present. But they did, yeah, but they didn't preserve it below what the motion for summary judgment states, because they didn't argue that they survived summary judgment because they had royalty damages. They didn't brief it, and it's the exact situation, as in GeoMetWatch, where plaintiff's counsel said, okay, okay, but we've got this other theory of business valuation that we disclosed in our supplemental disclosure. So when you move for summary judgment, that motion clearly would have encompassed royalties and not just unjust enrichment? Absolutely. We were moving to dismiss the trade secret claims, which there are three enumerated damages available, lost profits, unjust enrichment, or royalty damages as an alternative theory. And we moved to dismiss those claims for lack of causation, not just on unjust enrichment. And they didn't believe in this... For lack of causation, the causation that was missing with unjust enrichment was to show that the use of the trade secrets enabled them to get more employees. For royalties, as I understand it, you just value the information and say, you should have had to pay a royalty for the value of the information, even if it turned out to be totally unsuccessful. So the causation argument doesn't prevent the royalties claim, does it? Sure, but they didn't preserve that below because they did not have a royalty theory. The motion to exclude... But did you make that argument in your summary judgment? You didn't say anything about royalties. Shouldn't you have said they don't have any basis for their royalties? Yes, no, we actually did. In our statement of genuine facts, undisputed facts in our summary judgment, we said their only damages are unjust enrichment because royalty damages were excluded. But that's not accurate. They weren't excluded. They were excluded. What the judge said was basically you can't call them royalty damages. It was a very confusing order, but he definitely did not exclude them. And if you accept that they weren't excluded by that very confusing order, then you didn't move for summary judgment on causation as to royalty damages. Sure, by virtue of moving for summary judgment on those claims, the Federal Defense of Trade Secret Claim and the Utah Misappropriation of Trade Secret Claim, we moved for the dismissal of those claims not based upon a particular theory of damages, but based on... I'm sorry. I'm sorry. No, I don't want to interrupt you. Well, I don't think we're talking about the same thing. I mean, you filed a motion for summary judgment and you said, oh, the royalty claims have been excluded. But if we disagree with that, and I think I do, which is because that order didn't say that at all, then what was the basis for your summary judgment motion on the royalty damages? There was no evidence of royalty damage. And did you argue that? Yes. Okay. You argued that and didn't just put a statement of fact in that there was... No, this was a four-hour argument. Oh, we're talking about the actual argument? We briefed it and we argued it. And you briefed the issue of summary judgment on royalty damages based on their lack of proof of royalty damages? Yes. Of the $19 million. Now, I don't want to mislead you, but the way we characterized... That's not what I understood. Yeah, no. The way we characterized it in our briefing is they still cannot tell us the basis of this $19 million of royalty. Understand, throughout the course of the litigation, they said we're going to have an expert witness who gins up a royalty damage theory, something I'm very familiar with. I've seen lots of experts do that. Expert disclosures come, no expert opinion on royalty, nor any evidentiary basis for the $19 million disclosure, which came weeks after the close of Fact Discovery, and for the first time. And the final point, if I could make on this, when I deposed the owner and CEO of Moxie, because he was an unretained expert, so this was well after Fact Discovery, and I asked him, I said, Mr. Walton, what's the basis for this naked $19 million royalty? And he said, well, I was told that there was going to be an expert witness on that. Okay, let me... It's the procedural thing that bothers me. On this record, you probably have a good argument for summary judgment on the royalties issue. But if that issue wasn't presented in district court, then Moxie wasn't alerted that they had to give you that evidence at the time. So your motion for summary judgment, the document, from what I understand, simply said there is no royalty claim here, or something that's been disposed of. You said that where? In the Statement of Undisputed Facts? No, we stated in the body of the motion where we said that royalty damages were excluded. We understand Moxie disagrees because of the confusing nature of the order, which I concede. It was a confusing hearing. And I may have... That may be partly my fault because I think Judge Jenkins may have believed I was seeking to exclude all damages. Right? And he said, well, we're not going to talk about excluding the value of something that somebody took that wasn't there. Which judge said this? Judge Jenkins. Okay. This motion for summary judgment was before Judge Kemmel. Correct. Sadly, Judge Jenkins passed away shortly after that hearing. It was sad for many reasons. Yeah, he was a brilliant judge. So then at the hearing on your motion, was royalties discussed? Yes. Okay. Well, that may... Well, we'll have to look... You'll have to look at the record. And I do understand the... I mean, I think if you were bothered by the royalty thing... Okay. I understand. Thank you very much for your time. On this point, I think our understanding is the same as yours, Judge Moritz. There is no record evidence. This was all attorney argument. It's not in this briefing. It wasn't in the summary judgment briefing. This is all after the fact. The judge, frankly, in his order, threw out injunction and royalty damages without any analysis and without any record, without any opportunity to argue it. Did ABDIV in its motion for summary judgment, somewhere in that motion, assert that royalties were dismissed by Judge Jenkins? That's not my understanding. Did you say anything about royalties in your response? I was not the counsel below. But as I understand it, there's no record evidence of that. There's no record evidence that the Demoxy attorney said anything about royalties. That was an issue in that summary judgment. It wasn't in the briefing, and it wasn't directly addressed. And the judge did directly address it. It was addressed in the hearing. Are you saying it doesn't count if it was said at the hearing? If it was stated... There was some discussion at the hearing. As I recall seeing, there was some discussion at the hearing about the fact that there wasn't any... Essentially that you had given this $15 or $19 million figure for royalty damages, but that there was no backup, no basis for it. I think that came up at the hearing. It may have come up in passing, but it wasn't part of the summary judgment. It wasn't part of the judge's decision. I just also want to make it somewhat clearer. The evidence in the record is that Moxley did use... You're right. We don't have to show every single person, but they did use the information that recruited Spencer Raymond and Gus Beckard. That's in volume 26, pages 69, 41 to 42, and pages 70, 85, and 96. It's also in the record that they persuaded Zach Benson to accept a job. They're using that information. That's in several places in the record, and it's related in our brief. The discovery issue becomes kind of an interesting one because Judge Jenkins kind of seems not to have understood. What he restricted discovery on is he said you can only... This is why I'm somewhat getting whipsawed. He said you can only discover if it was somebody who was a Moxley employee who was persuaded to leave Moxley and go over to Apte. That's not our case. Yeah, but he said let's take a look at that. As I read what the judge said, he was saying let's look at that stuff. Then maybe we can do some more. I don't think he was cutting you off. The fact that it was another three months of discovery reinforces my view of that. I understand that from a discovery point. Where it's important, though, is they're now in the context of, say, the summary judgment and other things saying that you haven't shown anything. We have shown that they used the information. They used it to recruit people. They used it to recruit people who started there. The reasonable inference from everything else is this was really important to their business. What I want to focus on is why didn't you then, after getting the first discovery that was allowed by Judge Jenkins, why didn't you pursue depositions of at least some of the people who didn't work for Apte? That would have been the evidence that would have been most telling. They did. They did do depositions of the CEO, Mr. Bess Pearson. Salespeople. They did Kyle Nielsen, the Apte president of sales. I don't know if I'll get them all here. No, he's not asking about that. I'm not talking about the executives, the management. I'm talking about the people who would say who could testify. The sales reps. Well, of course I went to them. I believe they took the deposition of Benson, so that would be one. I can't remember if they took the depositions of Raymond and Becker. I'm looking to see if there's anything in my notes that would indicate that. Did you acknowledge that you could have pursued discovery on that issue if you had desired? It's not clear because my understanding, again, I wasn't the counsel below, but my understanding of what's in the record, and we mentioned this in our brief, is that they used the Judge Jenkins motion limiting to stop discovery. So any time we asked for things like that, they said no. But that's not what the order – the order would have permitted you to come back because it seemed to have been modulating the burden on the parties and sort of doing the classic discretionary thing that district court judges do all the time and wouldn't have prevented you from coming back. Yeah, if the lawyers had been a little more vigilant, yeah, could they have come back and done a reconsideration essentially? No, no, not a reconsideration, but come back and ask for more discovery. Oh, I see what you're saying. Well, but on that particular discovery, the judges had closed the door. So, you know, I'm happy to talk about it with the counsel and say should they have gotten more aggressive with Judge Jenkins. I've been in front of him many times, and sometimes that works, and sometimes it has a disastrous result. But I don't think it's – I don't think accepting the judge's order was necessarily a bad thing for them to have done. Thank you, Your Honor. Thank you very much. Thank you, counsel. Case is submitted. Counselor excused.